FILED
2012 Jun-12  PM 03:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

LISA M. MARTIN,                           )
             Plaintiff,              )
                          )
vs.                                       )     CASE NO. CV 11-J-2792-W
                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
             Defendant.              )

## MEMORANDUM OPINION

This matter is before the court on the record. This court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

## Procedural Background

Plaintiff applied for Supplemental Security Income benefits on August 20, 2007, alleging disability beginning January 1, 2005 (R. 56, 115-19) due to numerous debilitating physical and mental conditions (R. 19-21, 56, 135). The administrative law judge ("ALJ") denied plaintiff's application on December 7, 2009 (R. 60-71). The Appeals Council denied her request for review on June 14, 2011 (R. 1-3). The ALJ's decision thus became the final order of the Commissioner. *See* 42 U.S.C. § 405(g). This action for judicial review of the agency action followed (doc. 1). The

court has considered the entire record and whether the decision of the ALJ is supported by substantial evidence. For the reasons set forth below, the decision of the Commissioner is due to be **REVERSED**.

## Factual Background

Plaintiff Lisa Marie Martin[1] is a 36-year old female with an eighth-grade education and a GED (R. 29-30, 432). Her most recent full-time jobs have been as a cook and as a janitor, and she has no transferable skills (R. 19). Plaintiff has numerous physical limitations due to fractured vertebraes in the T8 through T12 level, arthritis of the knees and back, multiple surgeries on her knees, and neuropathy (R. 19-20). Plaintiff also has multiple mental limitations, including bipolar disorder, major depressive disorder, oppositional defiance disorder, borderline personality traits, panic attacks, suicidal ideations, a brain cyst, and Chiari malformation type 1 (R. 21, 27). Her GAF is 40 (R. 22).

Plaintiff testified that she is unable to perform any of her past jobs because of numerous debilitating physical and mental conditions. In her Disability Report, plaintiff averred that her condition first interfered with her ability to work in 1990 (R. 135). Plaintiff's back pain is so severe that "all [she] can do is lay around," with pain so consistent it "keeps [her] from moving most of the time" (R. 30-31). She lays on

---

[1] Plaintiff's last name has changed to "Riley" since her claim was filed. *See* R. at 29.

2

her couch or bed most of the day in order to relieve her back pain, and testified that she has been in that state for about three years prior to her hearing (R. 31-32). Plaintiff also suffers from debilitating migraine headaches, described as "chronic, classic, several times per month" (R. 33). When asked how the migraines affected her, plaintiff testified that the hurt was "constant," and said "[l]iterally I'm in a dark room. My eyes are closed, there's no noise. I, my, my head, it feels like somebody's hitting me in the head with an ax." (R. 33). She testified that she has suffered from the migraines as a child, that they have gotten worse over the years, and that the migraines can last anywhere from three days to a week, with an average length for the two-and-a-half years prior to her hearing before the Administrative Law Judge of three to four days (R. 34).

Plaintiff has had fifteen surgeries on her knees (R. 48). She testified that the pain in her knees is so bad that she once quit a job after two days because she couldn't handle standing on a concrete floor all day while she worked (R. 48). The knee pain causes it to be difficult for plaintiff to walk or stand, and she said it is "incredibly painful" to bend her knees (R. 49). She described the pain as a nine on a one-to-ten pain scale (R. 49), and testified it is so severe that she cannot even stand to take a shower, but must take a bath (R. 50). Plaintiff had not driven for an estimated three years prior to her hearing because operating the pedals caused her

3

such severe knee pain, and she believes her pain would make her an unsafe driver because it distracts her from operating the vehicle safely (R. 51). In her Physical Activities Questionnaire, filled out November 27, 2007 (R. 159), plaintiff wrote that because of arthritis in her knees, she is unable to sit or stand for more than one hour at a time (R. 154). She said she does not do yard work or shopping, cannot lift anything over ten pounds, and has difficulty "completing anything" (R. 156-58). She wrote that she can only perform most activities for ten to fifteen minutes before she must rest due to her condition (R. 159).

Plaintiff also testified that she has hypertension, and that her face "has been completely reconstructed" because of an injury (R. 52).

With respect to her mental health, plaintiff testified that she was diagnosed with bipolar disorder when she was seventeen, and that her "moods change drastically at the drop of a hat," which affects her ability to get along with other people and has resulted in her being fired from multiple jobs (R. 35-36, 40). Plaintiff also testified that she had her thyroid removed because of thyroid cancer, and that her lack of a thyroid affects her moods (R. 52). Plaintiff suffers from major depressive disorder (R. 36). She testified that there are days when she doesn't want to get out of bed and that she "do[esn't] get motivated easily," and that she struggles with her depression every day (R. 36, 44-45). She also suffers from debilitating panic attacks and from

4

oppositional defiance disorder, which makes it difficult for plaintiff to take instructions from people (R. 37). She testified that when she is given instructions by superiors, even though she knows it's for the requirements of the job, she "feels like [the supervisors] are trying to control" her, and that she just "can't do that" (R. 45-46). Plaintiff also has a history of suicidal thoughts, which occur regularly, and has attempted suicide (R. 37-38). In her Work History Report (R. 144-52), filled out November 27, 2007, plaintiff wrote "I just want to die and get my life over with" (R. 151).

In her Physical Activities Questionnaire, filled out November 27, 2007 (R. 159), plaintiff wrote that her family members "have taken the car keys to keep me from driving when they thought I was a danger to myself and others by my actions or my mood swings" (R. 154, 158). She also said that because of her mood, she sometimes neglects to bathe or even get out of bed, that her family has to make her get out of bed and make her eat, and that she sometimes feels like she "do[esn't] even want to live" (R. 155). In her  Daily Activities Questionnaire, also filled out November 27, 2007 (R. 165), plaintiff wrote that she gets out of the home "only when I have to," and noted "I don't like being around people[,] I have a short temper and I don't like being in a group" and "I don't do well with other people" (R. 163-64). She also admitted that "There are times in my life that I feel I could be a danger to

other people as well as myself" (R. 165).

Records from Indian Rivers Mental Health Center include a handwritten addendum dated April 16, 2008, with a note saying plaintiff is "homeless [and] needs resources" (R. 1321). A partial list of plaintiff's extensive medication history is also provided, *see* R. at 176.

Because plaintiff's medical history is extensive and her impairments numerous, her records will be summarized below chronologically according to the impairment to which they pertain.

**Plaintiff's Back/Spinal Pain, Guillain-Barré Syndrome and Polyneuropathy**

On December 17, 1998, plaintiff visited an emergency room in Kentucky reporting back pain after falling over a child (R. 283-84). Tests revealed a thoracic spine series demonstrating anterior wedging deformities of T8 and T9, and the examining physician reported concern about the possibility of compression fractures (R. 284).

On March 26, 1999, plaintiff visited a Kentucky emergency room complaining of weakness and loss of sensation in her lower extremities, difficulty walking, and back spasms (R. 275). When plaintiff was admitted, she could not move her lower extremities at all (R. 271). Initial tests and examinations including a lumbar puncture indicated possible Guillain-Barré Syndrome ("GBS") versus transverse myelopathy

6

(R. 272, 277-78). Subsequent electromyography studies "did show some abnormality, with S wave latencies of the common peroneal nerve on both sides, consistent with Guillain Barré syndrome" (R. 272). Records also indicate that plaintiff suffered "fractures from T8 to T12 level," but that no records were available to confirm those reports (R. 275). Plaintiff was started on intravenous gamma globulin and intravenous steroids (R. 272). Further examination revealed iron-deficiency anemia, and a complete work-up was suggested (R. 273-74). Plaintiff was discharged on April 2, 1999, following "some improvement and progress" including increased sensation in the lower extremities and partial return of movement, with a recommendation for "aggressive physical therapy and occupational therapy" (R. 273-74). Subsequent records indicate that plaintiff stayed at a rehabilitation hospital for "1-2 weeks where she continued to improve" and was subsequently sent home (R. 265).

Plaintiff returned to the emergency room on June 23, 1999, reporting weakness in her lower extremities and "loss or no control of her bowels and bladder" (R. 265). Plaintiff was diagnosed with chronic inflammatory demyelinating polyradiculoneuropathy, and an immune gammaglobulin therapy was initiated intravenously (R. 266). On June 25, 1999, plaintiff underwent a procedure for placement of a Port-A-Cath in order to commence this treatment (R. 267-68). A chest X-ray taken during an emergency room visit for chest pain on December 12, 1999,

revealed that the Port-A-Cath was in a "good position" but that plaintiff's heart was "mildly enlarged" (R. 258, 260).

Plaintiff returned to the emergency room on January 5, 2000, complaining of "a lot of pain in her back" following a fall against the corner of a wall (R. 252). X-rays of the T-spine and S-spine revealed "mild anterior wedging of the bodies of T8 and T9" which "appears chronic," "mild associated degenerative spurring" with "narrowing" of the T8-9 and T9-10 intervertebral disc spaces, "[m]ild narrowing of the intervertebral disc spaces at T7-8 and T8-9," and no acute fractures (R. 254). The physician's impression was that plaintiff had acute back pain and "[p]ossible exacerbation" of her GBS (R. 253).

Plaintiff visited Dr. Lovegildo Garcia on January 11, 2000, having been referred by a Dr. Crafton for evaluation because of "numbness and loss of feeling of the right extremities" (R. 240). Dr. Garcia's impression was that he was "really not sure about the exact etiology of her symptoms," other than to rule out left brainstem pathology and spinal cord pathology (R. 241). He ordered an MRI of the brain and the cervical, thoracic and lumbosacral spine to ensure her symptoms were not caused by pathology in the spine, and blood work to rule out small vessel disease (R. 242). X-rays revealed normal alignment in the cervical spine (R. 246), "very minimal scoliosis" in the lumbar spine (R. 247), and mild anterior wedging of T8 and T9 on

8

the thoracic spine with associated degenerative changes that are "probably chronic" (R. 248). An MRI of the brain revealed no abnormalities (R. 250).

Records from January 9, 2004, indicate that plaintiff was experiencing "back problems" caused by "very large breast tissue" despite recent weight loss in excess of 100 pounds (R. 301). Her physician recommended evaluation by plastic surgery (R. 301).

Plaintiff visited Dr. Donna Craig on July 1, 2005, complaining of "severe pain over the spine from mid thoracic all the way down to the sacrum as well as the paraspinal muscles," and was prescribed pain medications (R. 292). X-rays revealed "multiple areas of asymmetric disc space loss in the lumbar spine with secondary scoliosis and degenerative end plate changes" (R. 341), mild asymmetric disc space loss at L4-5 compatible with degenerative disc disease, mild asymmetric disc space loss at L3-4, and slight asymmetry at L1-2 and L2-3 which "creates mild lumbar scoliosis" (R. 342).

On October 20, 2005, plaintiff visited the emergency room complaining of back pain following a fall in the bathtub (R. 357). She was given pain medication (R. 357-58).

Plaintiff visited Dr. Eugene Marsh on September 11, 2007, complaining of burning and tingling in both feet (R. 1274). Dr. Marsh's impression was "[a]bsent or

9

slow responses in multiple nerve segments of both lower extremities, consistent with peripheral polyneuropathy" (R. 1274). Plaintiff then visited the emergency room on October 28, 2007, complaining of numbness, pain, and an inability to move her left leg (R. 1275). She was positive for paresthesias, weakness of the left leg, and hypocalcemia (R. 1275, 1279). She was treated with calcium supplements and discharged (R. 1279).

**Plaintiff's Knee/Leg Pain**

The earliest mention in the record of plaintiff's knee problems is found in records from an emergency room visit on March 26, 1999, for an unrelated complaint, in which the examining physician notes plaintiff's history of "knee surery for ligament injuries" (R. 275).

On April 19, 2000, plaintiff visited the emergency room with right knee pain one day after her knee "gave out" and plaintiff heard a "crunching, popping noise" followed by inability to walk on it (R. 237). The attending physician noted that plaintiff has "weak knees secondary to Guillain-Barré" (R. 237). Examination and x-rays revealed a right knee torn meniscus (R. 235, 238). The attending physician recommended a follow-up with Dr. Nash, rest, a knee immobilizer and crutches, ice, and elevation of the knee, and prescribed medication for pain and to prevent inflammation (R. 238).

10

On September 16, 2001, plaintiff visited the emergency room complaining of right anterior knee pain and right anterior shin pain, with an inability to fully bear weight on the lower leg, after a motor vehicle accident (R. 212). A provisional diagnosis of "acute right knee strain, probably internal derangement" was made (R. 212). Plaintiff was given a knee immobilizer and placed on pain and anti-inflammatory medications (R. 213). An x-ray revealed a change in the appearance of the medial tibial plateau, and the examining physician could not rule out a minimal medial plateau fracture (R. 214). A subsequent MRI taken on September 26, 2001, revealed "[a]bnormal appearance of the posterior horn and body of the medial meniscus" and a "[s]mall focal area of signal abnormality along with the lateral aspect of the patella along the articular surface" (R. 210).

On November 27, 2001, plaintiff visited the emergency room complaining of right leg pain and decreased ability to ambulate after falling and suffering a "twisting injury" (R. 207, 209). X-rays revealed no fracture or dislocation, though moderate spurring and moderate degenerative change was seen in the medial compartment (R. 207, 209). Plaintiff was discharged with crutches after having her knee immobilized (R. 207).

On August 4, 2003, plaintiff visited the emergency room following a car accident complaining of neck pain (R. 199-203). X-rays revealed no fracture,

11

dislocation or acute bony abnormality (R. 203). The records note plaintiff's history of Guillain-Barré syndrome (R. 199).

On August 18, 2004, plaintiff visited the emergency room complaining of injury to the right knee at work after she fell "with her right knee and leg twisted underneath her and slightly behind her" (R. 323). She was diagnosed with right knee strain and possible internal derangement and treated with painkillers, a right knee immobilizer and crutches (R. 324). She returned to the emergency room one week later, on August 24, 2004, complaining that her pain was twice as bad as before, that painkillers she was given were not effective, that she could "barely walk on her leg," and that any pressure on the leg was so painful that she could not wear the immobilizer (R. 326). She was diagnosed with a soft tissue injury of the right knee (R. 327). She was treated with intravenous pain medication, intravenous Valium, and intravenous fluids, discharged with instructions not to bear weight on her right leg, and told not to return to work until after a follow-up (R. 327). Records from a subsequent emergency room visit indicate that plaintiff underwent orthoscopic surgery on September 27, 2004, and physical therapy until December of 2004 (R. 337).[2]

Plaintiff visited a doctor on September 7, 2004, complaining of severe right leg

---

[2] Documents detailing these visits and procedures are not present in the record.

cramps and spasm (R. 296). Plaintiff reported that she had been informed she had a torn meniscus and was to undergo surgery several weeks later (R. 296-97). She was diagnosed with muscle spasms in the right lower extremity and prescribed medication to help ease her symptoms (R. 297).

On April 25, 2005, plaintiff visited Dr. Donna Craig complaining of bilateral knee pain, with pain in the right knee much worse than the left (R. 293). A plan to visit an orthopedist was discussed (R. 293).

On April 29, 2005, plaintiff visited an emergency room complaining of right knee pain (R. 337). Plaintiff reported intermittent knee pain since her September 2004 surgery and that she was in the process of being evaluated by orthopedic surgeons, and she requested pain medication, which was prescribed (R. 337-38). Records from a November 17, 2005, doctor visit indicate a possible diagnosis of prepatellar bursitis and potentially an underlying meniscal injury (R. 400).

Plaintiff visited the emergency room again for knee pain on December 14, 2005, and tests revealed "no clear etiology" for her pain (R. 363-64). Plaintiff stated in the records that she had had "three episodes" of her left knee giving out on her (R. 399). Plaintiff's knee was drained of fluid on that date (R. 398-99). Records also indicate that plaintiff suffered "re-injury" of the left knee on December 15, 2005 (R. 395). An MRI of the left knee taken December 23, 2005, revealed "abnormal signal

13

within the substance of the medial meniscus and recurrent tear cannot be totally ruled out," as well as "very minimal joint fluid" and "isolated irregular focal signal abnormality along the medial tibial plateau suggesting minimal osteochondritis desiccans" (R. 366-67). There also appeared to be "slight degenerative change" (R. 624).

An MRI of plaintiff's right knee on February 2, 2006, revealed a chronic tear with meniscal maceration posteriorly and medially with associated popliteal meniscofemoral cyst, as well as extensive cortical and chondral ulceration of the patellar facet laterally with lateral patellar bone edema, likely due to severe chondromalacia patellae (R. 620).

Plaintiff visited the emergency room on February 6, 2006, complaining of a right knee injury with severe pain subsequent to a fall after her right knee gave out on her while she was descending a staircase (R. 370). An MRI of the right knee taken that day revealed a chronic tear with meniscal maceration posteriorly and medially with associated popliteal meniscofemoral cyst, as well as extensive cortical and chondral ulceratin of the patellar facet laterally with lateral patellar bone edema, likely due to severe chondromalacia patellae (R. 368-69). Plaintiff was discharged with pain medications, crutches, and instructions to follow up with her orthopedist (R. 371).

14

Plaintiff visited the emergency room on July 14, 2007, complaining of an inability to straighten her left leg after falling and twisting her knee (R. 555). Examination revealed no abnormalities (R. 555). Plaintiff was discharged with anti-inflammatory medication and instructions to wear a knee immobilizer and use crutches until released by an orthopedist (R. 560).

Plaintiff visited the emergency room on July 27, 2007, complaining of left knee pain after falling on a boat dock (R. 540). Studies revealed mild medial and patellofemoral joint compartment narrowing (R. 544). Plaintiff visited the emergency room on November 19, 2007, complaining of leg cramps (R. 855-58). She was treated and released (R. 858). She visited the emergency room again on January 22, 2008, complaining of left knee pain and a headache after a fall (R. 877-85). Tests revealed no major injuries (R. 887-88).

Plaintiff visited the emergency room on September 29, 2008, complaining of ankle tenderness and difficulty with weight-bearing after a fall (R. 1209-10). She was diagnosed with an ankle sprain and treated accordingly (R. 1210, 1220-21).

Plaintiff visited the emergency room on April 20, 2009, complaining of pain after twisting her right knee on the stairs (R. 1262-65). Examination revealed no permanent injury, and plaintiff was discharged with pain medication (R. 1265).

**Plaintiff's Migraines and Chiari 1 Formation**

On April 1, 2002, plaintiff visited the emergency room complaining of a severe headache that had lasted for three days (R. 204). She was diagnosed with migraine cephalalgia, and meningitis was ruled out as a cause of her headaches (R. 204).

Records from a July 12, 2004, doctor visit indicate plaintiff complained of normally having one to two migraines per month, but that increased stress at work caused her to have three per week (R. 298).

Plaintiff visited the emergency room on February 10, 2006, complaining of a severe migraine headache and associated nausea and vomiting (R. 373). She was given prescriptions for medications for migraines and nausea and instructed not to operate a motor vehicle (R. 374-75). Plaintiff returned to the emergency room for a migraine headache, nausea, and dizziness on February 22, 2006 (R. 376). She was treated with intravenous fluids and medication for nausea and discharged (R. 377). Plaintiff again returned to the emergency room on March 8, 2006, with complaints of a migraine headache, nausea, and vomiting (R. 378). She told her physicians her migraines had become more frequent (R. 378). She was treated with medication for nausea and discharged (R. 379).

Plaintiff again went to the doctor on March 17, 2006, complaining of "[i]ntractable headaches" (R. 390). An MRI of the brain without contrast taken March 24, 2006, revealed "low position of the cerebellar tonsils extending about 6mm below

the foramen magnum with effacement of the CSF suggesting mild chiari type malformation," and it was noted that "clinical correlation is needed" (R. 381-82). Plaintiff followed up on April 18, 2006, and reported some improvement after taking Topamax,[3] 50 mg/twice daily (R. 389).

Plaintiff returned to the emergency room for a migraine on April 25, 2006 (R. 383). She was treated with pain medication and released (R. 384). A follow-up on May 3, 2006, indicated that this was plaintiff's only severe migraine episode that had occurred since she started taking the Topamax (R. 388).

Plaintiff again visited the emergency room on both July 17, 2006, and August 16, 2006, for migraines (R. 420-27). Both times she was treated with pain and nausea medication and discharged (R. 423, 427).

Plaintiff visited the emergency room on October 7, 2007, complaining of symptoms of a migraine headache (R. 536). She was treated with nausea and pain medication and released (R. 533-34). Plaintiff returned to the emergency room the next day, October 8, 2007, complaining of a migraine headache that had been ongoing for several days, including two days of nausea and vomiting (R. 526). Plaintiff was advised to follow up with a neurologist (R. 528).

---

[3] Topamax is a brand name of Topiramate, a generic drug used to treat migraine headaches and seizures. *See* Physicians' Desk Reference 127 (PDR Network, LLC, 2011).

17

Plaintiff visited the emergency room numerous other times complaining of migraines, including on January 8, 2008 (R. 867-74), February 9, 2008 (R. 891-99), and February 24, 2008 (R. 924). CT scans taken February 24, 2008, confirmed a diagnosis of "Equivocal Chiari I malformation" with "[p]robable dilated perivascular space in the inferior left basal ganglia" (R. 924). She returned to the emergency room for migraines on October 9, 2008 (R. 1203-04).

On March 9, 2009, plaintiff visited the doctor to follow up regarding treatment for migraines (R. 1200). Plaintiff reported that the migraines became progressively worse over the past three months, increasing in frequency to one or two per week (R. 1200). Plaintiff reported she was then experiencing a migraine that had lasted for two days without abating, and that she had not slept during that time period (R. 1200). She also reported "severe right sided stabbing pain over the frontotemporal region that is associated with nausea, vomitting [sic], and sensitivity to light and noise" (R. 1200). Plaintiff's assessment was "Classical Migraine Without Mention Of Intractable Migraine – Worsening" (R. 1201). She was prescribed Topamax, 100 mg/thrice daily (an increase in dosage) and Valium, 5 mg/once daily at bedtime (R. 1201).

Plaintiff returned to the emergency room for migraine-related symptoms on the

18

following dates: March 30, 2009, where she was prescribed Meperidine,[4] 25 mg/daily, and Promethazine,[5] 50 mg/daily, which she was advised would make her sleepy (R. 1224-26, 1230); April 7, 2009 (R. 1235-38); and April 8, 2009, for the same migraine for which she visited on April 7, and which had not ceased (R. 1249-52).

**Plaintiff's Thyroid Disorder**

An ultrasound of the thyroid was read on November 6, 2006; the examining radiologist, Dr. Alton Baker, gave his impression that findings "most likely represent Hashimoto Thyroiditis and a multinodular goiter" (R. 470). A thyroid scan and uptake form read by Dr. Bryan Billions on November 9, 2006, revealed "markedly abnormal thyroid uptake with generalized homogenous radiotracer update within both lobes of the thyroid" (R. 471).

On November 29, 2006, plaintiff was seen by doctors in Alabama in consultation for toxic multinodular goiter (R. 457). On that date, she was positive for fevers, chills, continual weight loss, decreased appetite, hot flashes, mood swings,

---

[4] Meperidine is a brand name of Demerol, a generic drug used to relieve moderate to severe pain. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000583/ (last visited June 4, 2012).

[5] Promethazine is a brand name of Phenergen, a generic drug used, *inter alia*, to treat nausea and vomiting. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000637/ (last visited June 4, 2012).

insomnia, sore throat, intermittent shortness of breath with some hemoptysis, tachycardia, muscle aches, and leg cramps, as well as some reported intermittent nausea, vomiting, and constipation (R. 457). Plaintiff's medications on that date were listed as follows: PTU (Propylthiouracil), 100 mg/twice daily;[6] Lortab, 7.5 mg/daily at bedtime and 5 mg/daily as needed; Lexapro, 10 mg/daily; Temazepam, 50 mg/daily at bedtime;[7] Metoprolol, 100 mg/twice daily;[8] Topamax, 50 mg/daily;[9] and Phenergan, once daily in the afternoon[10] (R. 484). Plaintiff was diagnosed with toxic multinodular thyroiditis, with a history of hyperthyroidism and resistance to treatment with PTU, including a possible reaction to initiation thereof (R. 484). Treatment consisting of radioactive iodine or surgery was discussed  (R. 484). Records from December 12, 2006, note "abnormal update in both lobes compatible with Grave's

---

[6] Propylthiouracil is a medication used to treat hyperthyroidism that works by stopping the thyroid gland from making thyroid hormone. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000687/ (last visited June 4, 2012).

[7] Temazepam is a generic drug used to treat insomnia. *See* Physicians' Desk Reference 127 (PDR Network, LLC, 2011).

[8] Metoprolol is a generic drug used to treat hypertension. *See* Physicians' Desk Reference 124 (PDR Network, LLC, 2011).

[9] Topamax is a brand name of Topiramate, a generic drug used to treat migraine headaches. *See* Physicians' Desk Reference 127 (PDR Network, LLC, 2011).

[10] Phenergan is a brand name of Promethazine, a generic drug used to treat nausea and vomiting. *See* Physicians' Desk Reference 126 (PDR Network, LLC, 2011).

disease" (R. 481). That date, plaintiff was placed on Tapazole, 20 mg/daily[11] (R. 482).

Subsequent to a follow-up on January 5, 2007, her dosage was increased to 10

mg/three times daily (R. 480).

Plaintiff was next examined by Dr. Richard Rosenthal on August 15, 2007 (R.

479). She was noted to have missed her last two doctor visits, to have been

noncompliant with her medicine and to have lost a significant amount of weight

recently (R. 479). Dr. Rosenthal's plan was to get plaintiff "in a better thyroid state"

and then to consider surgery (R. 479).

On October 26, 2007, plaintiff underwent a total thyroidectomy by Dr. Glenn

Peters due to a toxic multinodular goiter, and was discharged (R. 490-93). Two days

later, on October 28, 2007, she returned to the emergency room complaining of pain

and numbness all over her body, muscle spasm, and an inability to move her left leg

(R. 500, 502, 508; *see generally* R. 500-20). She was found to have post-surgical

hypocalcemia (low calcium) and was positive for parasthesias and weakness of the

left leg (R. 503, 509). Plaintiff was treated with intravenous calcium gluconate and

was discharged three days later (R. 501-04). Records also indicate a diagnosis of

hypoparathyroidism that might be temporary or permanent, and for which plaintiff

---

[11] Tapazole is a brand name of Methimazole, a generic drug used to treat
hyperthyroidism. *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000686/ (last visited
June 4, 2012).

might possibly need treatment for the rest of her life (R. 509). Plaintiff was instructed post-surgery to resume all pre-surgery medications with additions of temporary pain medication and Synthroid,[12] 150 mg/daily (R. 579).

Plaintiff followed up with her surgeon on November 1, 2007 (R. 573). Her final pathology report showed patchy, lymphocytic thyroiditis with no evidence of malignancy (R. 573). Plaintiff also had weakness of the left true vocal chord (R. 573).

**Plaintiff's Mental Health**

Records from a January 9, 2004, physician visit note that plaintiff had "[r]ecurrent depression" but was "[d]oing very well with the Lexapro" (R. 301).

Records from March 8, 2004, note "[r]ecurrent depression" that is "[n]o better whatsoever" and observe that because "[plaintiff] has had no improvement with Lexapro [she] has decided to stop it" (R. 300). The attending physician also noted "problems" falling asleep and insomnia as a result of anxiety (R. 300). She was prescribed Risperdal[13] and instructed to return in one month (R. 300).

Plaintiff visited Dr. Donna Craig on January 31, 2005, complaining of anxiety which was not well controlled by medications (R. 294). Dr. Craig advised plaintiff

---

[12] Synthroid is a brand name of Levothyroxine, a generic drug used to treat numerous maladies of the thyroid. *See* Physicians' Desk Reference 123 (PDR Network, LLC, 2011).

[13] Risperdal is a brand name of Risperidone, a generic drug used to treat bipolar disorder, mania, psychosis, and schizophrenia. *See* Physicians' Desk Reference 126 (PDR Network, LLC, 2011).

that it would be "best" to visit a mental health professional, but "elected to start her on Effexor[14] since she has not tried that" drug (R. 294). Dr. Craig prescribed "the 150 mg dose" and advised a follow-up, reiterating plaintiff's need to visit a mental health professional (R. 294).

Plaintiff again visited Dr. Craig on July 1, 2005, complaining of anxiety related to "extreme family stresses related to a child with ADD, child support issues, and her own ongoing psychiatric problems" (R. 292). Plaintiff reported finding no medication working well for her "aside from a trial of Xanax[15] years ago" (R. 292). Plaintiff was given a 90-tablet prescription of a 0.5 mg dosing and advised to continue with mental health counseling (R. 292).

Plaintiff's mental health records are a bit spotty, but she appears to have undergone an intake evaluation with the Indian Rivers Mental Health Center on December 7, 2007 (R. 1348). Plaintiff reported having been diagnosed with and treated for bipolar disorder since she was thirteen years old, as well as mood swings and depressive episodes with periods of feeling suicidal, difficulty sleeping, and outbursts of anger and violence (R. 1348).

---

[14] Effexor is a brand name of Venlafaxine Hydrochloride, a generic drug used to treat anxiety, depression, and major depressive disorder. *See* Physicians' Desk Reference 127 (PDR Network, LLC, 2011).

[15] Xanax is a brand name of Alprazolam, a generic drug used to treat anxiety and panic disorder. *See* Physicians' Desk Reference 117 (PDR Network, LLC, 2011).

23

On February 11, 2008, plaintiff visited the emergency room complaining of a left jaw injury after having been hit in the face with a vodka bottle by her alcoholic stepmother, for whom patient cares along with her alcoholic father (R. 902-04). No permanent damage was revealed by an examination, and plaintiff was prescribed ice, pain medication and anti-inflammatories and released (R. 905-06).

Records indicate plaintiff commenced individual and group therapy "as needed" on April 16, 2008 (R. 1324). Plaintiff's Initial Diagnostic Evaluation from that date (though the document itself is dated April 21, 2008) indicates a diagnostic impression of bipolar mixed with history of alcohol abuse; borderline personality traits; history of various cancers and thyroid disorders discussed *supra*; problems with primary support group and interaction with legal system in Pahrump; and a Global Assessment of Functioning ("GAF") score of 40 (R. 1385).[16] That same day, plaintiff indicated she was not interested in working at that time, as she was fighting for her disability (R. 1404). Plaintiff also noted she was living in her father's car and with friends (R. 1405).

On May 29, 2008, a "Therapeutic Progress Note" filled out by Angela

---

[16] The records note that a GAF score of 40 indicates "Major impairment in several (2+) areas of functioning," including "[s]ubstantial impairments with work, school, housework, friends or family relationships, problem solving, making decisions, paranoia, constant depression (hopeless)" and "some hallucinations, delusions" (R. 1332).

Rossomanno, L.C.S.W., P.I.P., noted that plaintiff reported "she still has some severe mood swings but they are much more 'leveled out' and that she feels medication is working" (R. 1338). Plaintiff reported that she was homeless and slept in her car at night (R. 1341). Plaintiff also reported having attempted suicide "10 or 15 times" using various methods including cutting herself, trying to drown herself, and jumping in front of cars (R. 1341). She reported a history of domestic violence, including losing one of a pair of twins with which she was pregnant due to being beaten (R. 1341). On that same date, plaintiff and Ms. Rossomanno both signed an "anti-suicide contract," the stipulations of which included a promise by plaintiff to notify Ms. Rossomanno or another therapist if she should feel suicidal (R. 1340). On May 15, 2008, plaintiff further reported to Ms. Rossomanno an extensive history of family discord, including numerous marriages and break-ups, family tensions, and a feeling that "everyone hate[s] me" (R. 1339); *see also* R. at 1350-58 (records of family group counseling in 1991).

In an Office Visit Follow-Up note from May 1, 2008, Diann Crane, CRNP, noted that plaintiff complained of an increase in depression (R. 1379). In an Outpatient Clinic Follow-up Note from June 2, 2008, a Dr. Syed Aftab opined that plaintiff's "[i]nsight and judgment appear[] to be fair at best" (R. 1375). He discussed proper treatment of bipolar disorder and recommended increasing plaintiff's

medication dosing (R. 1375-76). An extensive list of the psychotropic and other medications plaintiff was prescribed between April and November of 2008 appears at  R. 1359-60. Prescription guidelines signed by plaintiff are also present, *see* R. at 1361.

A medical source statement (mental) was completed by a Dr. Syed Aftab on August 8, 2008 (R. 864-65). Dr. Aftab found limitations in every single one of nineteen categories of assessment, including "mild" limitations in only two, "moderate" limitations in seven, and "marked" limitations in ten (R. 864-65). He also replied in the affirmative to the question "Have the claimant's impairments caused limitations that have lasted, or can they be expected to last, for twelve months or longer at the level of severity indicated?" (R. 865).

 Handwritten notes in documents labeled "Treatment Plan Preview/Revision" and assigned various dates then make the following observations: On October 1, 2008, "Has not seen therapist since May, no showed therapy on 6-11-08 and no upcoming therapy appts. . . . New POC will be needed in December." (R. 1327); On January 23, 2009, "Last seen in clinic 11-7-08 [and] some progress noted" (R. 1327); On April 23, 2009, "No showed for clinic 3-6-09, last seen 11-7-08, some symptoms noted" (R. 1326); On July 9, 2009, "Continues to need new POC. No showed for clinic 3-6-09, last seen 11-7-08–cannot assess client progress" (R. 1326); on July 16,

2009, "No showed 7-16-09. No upcoming [appointments]" (R. 1325).

**Plaintiff's Miscellaneous Maladies**

Plaintiff has a history "significant for poor dentition and a history of tooth infection" presenting with swelling and pain in the face (R. 658). Plaintiff has had numerous teeth extracted. *See, e.g.*, R. at 652-89, 847-48.

Plaintiff was diagnosed with gallstones with acute cholecystitis on January 26, 2009 (R. 1012, 1167). She underwent a laparoscopic cholecystectomy to remove her gallbladder on that date, was prescribed pain medication and released (R. 1012-13, 1019-25).

One of the records from plaintiff's gallbladder procedure makes passing mention of the fact that plaintiff has a pacemaker (R. 1285). No other reference to a pacemaker, or to when it was implanted, is found in the record.

A document in plaintiff's mental health treatment records dated April 21, 2008, notes that plaintiff has a history of ovarian, uterine and thyroid cancer, as well as arthritis and neuropathy (R. 1384-85). Plaintiff also reported having had over 40 surgeries due to a car accident in 1995 (R. 1384).

**Plaintiff's Clinical Assessments for Purposes of Social Security Disability**

On October 3, 2006, plaintiff underwent a consultative examination by Jack Bentley, Ph.D. (R. 431-34). In his report, Dr. Bentley noted that plaintiff had been

27

having "severe" financial difficulties and "ha[d] not had food in two days" (R. 432). He observed that plaintiff was "unusually histrionic" during the evaluation, complaining that the lights increased the severity of her head pain, and that she "winced and grimaced periodically" while communicating with him (R. 432). Dr. Bentley's diagnostic impression was that plaintiff has "Major Depression, Recurrent, Moderate," suffers from chronic migraine headaches, and has a history of knee surgeries (R. 433). His prognosis was "Guarded" (R. 433).

A Psychiatric Review Technique was completed October 16, 2006, by Dr. Aileen McAlister (R. 435-48). The clinician found "moderate" impairment in plaintiff's restriction of activities of daily living, her difficulties in maintaining social functioning, and her difficulties in maintaining concentration, persistence, or pace (R. 445). Dr. McAlister also submitted the Mental Residual Functional Capacity Assessment (R. 449-52), in which she found "moderately limited" impairment in numerous categories: plaintiff's ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the general public; her ability to

accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and her ability to respond appropriately to changes in the work setting (R. 449-50). Dr. McAlister's ultimate functional capacity assessment was that plaintiff is "capable of understanding[,] remembering, and carrying out simple instructions over an [eight hour] work day with routine breaks" and that "[c]ontact with coworkers, supervisors, and [the] general public should be casual and non-confrontational and changes in the work place introduced slowly due to [major depressive disorder,] recurrent, severe" and "anxiety" (R. 451). Nowhere does Dr. McAlister's assessment mention plaintiff's Guillain-Barré syndrome, her chronic migraines, or her Chiari I malfunction.

A psychological evaluation and medical source statement (mental) (R. 190-98, 1410-19) completed on January 29, 2010, by John Goff, Ph.D., a clinical neuropsychologist, revealed numerous limitations as a result of plaintiff's mental condition. In no category of evaluation was plaintiff noted not to suffer from any impairment (R. 190-91). Plaintiff was noted to suffer from "mild" impairments in her ability to understand both simple and detailed or complex instructions and her ability to remember simple instructions (R. 190). Plaintiff's limitations are "moderate" in her ability to carry out simple instructions, remember detailed or complex instructions,

respond appropriately to customers or other members of the general public, and maintain activities of daily living[17] (R. 190-91). Plaintiff has "marked" limitations in her ability to carry out detailed or complex instructions, to respond appropriately either to supervision, to co-workers, or to customary work pressures, to deal with changes in routine work setting, to use judgment in detailed or complex work-related decisions, and to maintain attention, concentration, or pace for periods of at least two hours (R. 190-91). Dr. Goff also noted "marked" to extreme limitations with respect to plaintiff's "estimated degree of deterioration in personal habits" and "estimated degree of constriction of interests" (R. 191).

Dr. Goff's Confidential Psychological Evaluation noted that plaintiff reported having repeated several grades in school and having been in special education classes for several subjects (R. 1414). He also noted that plaintiff obtained a "low average" IQ when administered the standard IQ test, and that plaintiff had marginal functional literacy (R. 1415-16). With respect to plaintiff Chiari 1 malformation, Dr. Goff noted that "[p]atients with that condition do frequently have problems with their lower extremities. They have numbness or a loss of function . . . [and] sometimes break their feet . . . because of the recurrent problems they have with posture and such" (R.

---

[17] Dr. Goff drew an arrow pointing from "Moderate" to "Marked" on the form, which could indicate that he saw plaintiff's impairment as increasing. *See* R. at 1411.

1416).

Dr. Goff's report otherwise corroborates symptoms and ailments which plaintiff has reported and sought treatment for as demonstrated elsewhere in the records. He noted that plaintiff "would be seen as a bit odd and unusual by supervisors and co-workers and would not be reliable in terms of attendance," and that "there are numerous physical and psychological issues interfering with her ability to deal with the stresses and pressures of the workplace" (R. 1417). His ultimate conclusion was that plaintiff has "a combination of issues . . . involving psychological and physical etiologies combining to create a situation where she is not really able to function adequately from a social standpoint or certainly from a vocational standpoint" (R. 1417). Notably, he expressed concern that no treatment provider "has ever put the issues together so to speak in regard to her situation in general," such that her medical and especially mental health treatment "has not . . . availed" plaintiff much [sic] over the years (R. 1417).

Dr. Goff's diagnosis was that plaintiff has "Pain Disorder with Psychological Features and associated with Several General Medical Conditions," "Major Depressive Disorder associated with Physical Condition," no "Conversion Disorder," and "indications for a somewhat passive-aggressive and perhaps dependent personality style" (R. 1417-18). His conclusion was that "[t]he combination of

31

difficulties [plaintiff] demonstrates in regard to pain sensitivity and preoccupation associated with her pain and depression would seem to represent severe impairments" (R. 1418).

At the hearing before the ALJ, the Vocational Expert ("VE") testified that based on her mental impairments, her migraines, and her back pain, plaintiff would not be able to work (R. 38). He further testified that even if plaintiff were able to get work, she would have "problems" taking directions and getting along with people, making it "unlikely she would succeed with the work when she got there" (R. 38-39).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *See id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Martin v. Sullivan*, 894 F.2d 1520,

1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987). "Even if the Court finds that the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence." *Allen v. Schweiker*, 642 F.2d 799,800 (5th Cir.1981); *see also Harwell v. Heckler*, 735 F.2d 1292 (11th Cir.1984); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990).

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v.*

*Sullivan*, 92 F.2d 1233, 1235 (11th Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145-46.

When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion as against the opinions of other physicians. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker*, 826 F.2d at 1000. The ALJ must also consider the combined effects of all impairments. *Davis v. Shalala*, 985 F.2d 528, 533 (11th Cir. 1993); *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987). The ALJ must evaluate the combination of impairments with respect to the effect they have on the plaintiff's ability to perform the duties of work for which he or she is otherwise capable. *Lucas v. Sullivan*, 918 F.2d 1567, 1574 (11th Cir. 1990). Merely reciting that the plaintiff's impairments in combination are not disabling is not enough. The ALJ is required to make specific and well articulated findings as to the effect of the combination of impairments. *Walker*, 826 F.2d at 1001.

## Legal Analysis

In this case, the Administrative Law Judge ("ALJ") found that plaintiff suffers

from the severe impairments of migraine headaches, bipolar disorder, major depressive disorder, borderline personality traits, mild degenerative joint disease of the knees, and mild degenerative changes in the spine at multiple levels (R. 62). Despite these half-dozen severe impairments, the ALJ denied the plaintiff benefits on the grounds that "no treating, examining, or reviewing physician has suggested the existence of any physical impairment or combination of impairments which would meet or medically equal the criteria of any listed impairment" (R. 64). The ALJ also selectively reviewed the available evidence and disregarded eight more medically verifiable ailments from which plaintiff has suffered. After summarizing his reasons for so doing (*see* R. at 63-64), he writes:

> Outside of the above noted severe impairments, the records does [sic] not support a finding that the additional medically determinable impairments result in any more than minimal functional limitations in the claimant's ability to engage in the basic physical or mental work-related activities. Indeed, no treating or examining physician has ever associated any functional limitation with the claimant's alleged fractured vertebrae in the thoracic spine, arthritis in the knees and back, neuropathy, dyspnea, rapidly pounding heart, Guillain-Barré syndrome, oppositional defiant disorder, brain cysts, [C]hiari [I] malformation of the brain stem, hyperthyroidism, or syncope, and therefore, they are considered nonsevere impairments for the purposes of this claim.

(R. 64). Ultimately, he concluded that plaintiff retains a residual functional capacity

35

to perform "the full range of sedentary work," as "the evidence establishes that the claimant is capable of completing the [following] basic mental and physical demands of competitive, remunerative, unskilled, sedentary work on a sustained basis": the ability to understand, carry out, and remember simple instructions, to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting, as well as the ability to sit for a total of 6 hours in an 8 hour day, lift not more than 10 pounds at a time, and occasionally lift or carry articles like docket files, ledgers, and small tools (R. 66, 70-71).

The ALJ's opinion in this case is legally erroneous. The ALJ's findings are not just not supported by substantial evidence; they appear to contradict the overwhelming weight of substantial evidence, which the ALJ has blatantly discounted. Moreover, his sardonic demeanor and tone throughout the hearing and his opinion are also insulting to the plaintiff—a woman who has suffered greatly in her short and troubled life— and wholly unnecessary.[18] The Eleventh Circuit Court of Appeals has stated that the

---

[18] The ALJ made sarcastic asides and condescended to plaintiff—a woman of documented mental imbalance and limited intelligence—throughout the hearing; *see, e.g.*, R. at 27, 41-42, 45. In his opinion, before reaching the substance, the ALJ criticized plaintiff for having unsuccessfully sought SSI benefits in the past, saying she is a "serial filer" for disability (R. 60). That plaintiff's past filings were unsuccessful is in no way evidence that her current pending application is not meritorious, or even relevant to the inquiry. The ALJ also dismisses plaintiff's medical history, stating "[g]iven the very young age at which she first filed, one might ordinarily expect *rather more significant evidence* of an alleged disability than what the claimant has presented" (R. 60) (emphasis added). This despite the fact that plaintiff has presented over 1,400 pages of medical records, which even yet do not cover every surgical procedure and

opinion of a treating physician is to be given substantial weight in determining disability. *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986); *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986); *Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). Absent good cause to the contrary, the Commissioner must accord substantial or considerable weight to the treating physician's opinion. *See Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987); *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ has blatantly disregarded that standard here.

With respect to plaintiff's alleged physical disability, the ALJ found that plaintiff has only mild to moderate restriction in activities of daily living, maintaining social functioning, maintaining concentration, persistence, or pace, and no episodes of decompensation (R. 65). The ALJ supports this assessment by opining that "no treating or examining physician has ever associated functional limitations with any of [plaintiff's] medically determinable severe or nonsevere physical impairments," and arbitrarily decides it is a "reasonable accommodation to limit [plaintiff] to no

---

professed ailment from which she suffers, cataloguing literally dozens of emergency room visits, over twenty medical procedures, confirmed diagnoses of at least ten different physical ailments over the course of the past decade, a history of mental illness and physical abuse from an extremely early age, and a near-total inability to function adequately in the normal course of human society.

more than sedentary levels of exertion" based on nothing more than "the consistency of [plaintiff's] complaints of pain and [physical] impairment . . . as well as diagnostic imaging and objective medical treatment" (R. 67-68). In other words, the ALJ has arbitrarily assigned plaintiff an effective "level of ability" based upon his subjective interpretation of plaintiff's treatment records. He also completely disregards the reality of plaintiff's treatment situation. Nearly all of her medical consultations and procedures with respect to her physical health have occurred under the auspices of emergency room care, such that plaintiff has never had one consistent "treating" physician for her various ailments for any significant duration of time. Thus Dr. Goff's conclusion that no treatment provider "has ever put the issues together so to speak in regard to her situation in general," such that her medical and especially mental health treatment "has not . . . availed" plaintiff much [sic] over the years (R. 1417)—an assessment the ALJ declines even to mention in his opinion.

With respect to plaintiff's mental health, the ALJ found that though the records support plaintiff's diagnosis of bipolar disorder, major depressive disorder, and borderline personality traits, "said impairments do not significantly affect her ability to engage in basic mental work-related activities," and he opined that "no treating or examining psychiatrist or psychologist has ever associated functional limitations with any of the claimant's medically determinable mental impairments" with the exception

of the Medical Source Statement (Mental) submitted by Dr. Syed Aftab in August 2008 (R. 68). He further contends that "neither the claimant's GAF scores nor the opinion of Dr. Aftab are supported by the claimant's mental health treatment records they purport to be based upon," and criticized some of these records for being "reported by a licensed clinical social worker and a certified nurse practitioner rather than an accepted medical source" (R. 68).

The term "acceptable medical source" is a term of art the Social Security Administration uses to describe medical sources who must have made a diagnosis to establish the existence of an impairment. *See* 20 C.F.R. § 416.913(a) (2011). A licensed physician must diagnose a medical disorder. *See id.* at § 416.913(a)(1). In this case, Dr. Aftab, a treating psychiatrist at Indian Rivers, did so. *See* R. at 1379-80. Once a condition is diagnosed by such a source, the Social Security regulations specifically allow consideration of other sources, including nurses and social workers, to determine the severity of an individual's impairment and its affect on that individual's ability to work. *See* 20 C.F.R. § 416.913(d)(1) (listing "nurse-practitioners . . . and therapists" as acceptable sources in this regard).

Accordingly, it was plain legal error for the ALJ avowedly to disregard the reports of these mental health professionals. Dr. Aftab found limitations in every single one of nineteen categories of assessment, including "mild" limitations in only

two, "moderate" limitations in seven, and "marked" limitations in ten (R. 864-65). He also replied in the affirmative to the question "Have the claimant's impairments caused limitations that have lasted, or can they be expected to last, for twelve months or longer at the level of severity indicated?" (R. 865). Under the regulations, "[i]f . . . a treating source's opinion on the issue(s) of the nature and severity of [a plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. 416.927(c)(2) (2012). Both plaintiff's medical records dating to her teenage years and the reports of the other mental health professionals, as well as the diagnostic report of Dr. Goff, corroborate Dr. Aftab's diagnosis. Moreover, no other examining doctor, including the Social Security Administration's consultant, offered any medical source statement contradicting the detailed evaluations of Drs. Goff and Aftab regarding plaintiff's ability to function. The applicable regulations specifically instruct the ALJ to accord these reports proper weight, and he failed to do so.

Nearly the sum total of the other evidence the ALJ cites for his conclusion consists of the findings of the State agency psychiatric consultant, Dr. Bentley, and the consultative psychological examination (R. 65). Dr. Bentley's assessment is based on a one-time in-person interview with plaintiff, and the ALJ properly assigns it only

partial weight (R. 69). However, he erroneously assigns the findings of the State agency psychiatric consultant, Dr. Aileen McAlister, "great weight" because, he asserts, it accords with Dr. Bentley's assessment and with plaintiff's "limited treatment records" (R. 69). Dr. McAlister's report is dated October 16, 2006, which appears to be from one of plaintiff's previous SSI applications. *See* R. at 69, 435-52. And she never even saw or examined plaintiff. The Eleventh Circuit has repeatedly held that the opinion of a non-examining reviewing physician is entitled to little weight and, taken alone, does not constitute substantial evidence to support an administrative decision. *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990). "[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at best." *Spencer on behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985). The opinion of non-examining, reviewing physicians, when contrary to those of examining physicians, are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence. *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987). The ALJ's justification for ignoring plaintiff's medical records and the reports of her treating physicians and mental health professionals in favor of non-treating, non-examining, and even non-physician opinions of disability examiners is erroneous, bordering on ludicrous.

This case presents a particularly egregious example of an ALJ disregarding the weight of objective medical evidence in favor of his own subjective opinion about how a truly disabled plaintiff "should" present. An ALJ may only reject the opinion of a physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.2d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.2d at 1241. With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so. *Id.* at 1240-41.

*Winschel v. Comm'r of Soc. Security*, 631 F.3d 1176, 1179 (11th Cir. 2011). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r of Soc. Security*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).

None of these factors is present here. The medical record is not wholly

42

conclusory or internally inconsistent; it is supported by over a decade of treatment records, for plaintiff's physical ailments, and by records dating to at least 1991 pertaining to plaintiff's mental disorders. It is also not based entirely on plaintiff's subjective complaints; the sheer amount of medication taken, number of procedures plaintiff has undergone, and number of emergency room visits support this. The ALJ does not have "good cause" for his blatant disregard of the opinions of the physicians and other medical professionals of record, which likely explains why he provides no sufficient justification for his conclusions.

The law also requires the ALJ to evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) ("an ALJ must make specific and well-articulated findings *as to the effect of the combination of impairments* when determining whether an individual is disabled") (emphasis added). Accordingly, the ALJ must make it clear to the reviewing court that he has considered all alleged impairments, both individually *and in combination*, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987); *Davis*, 985 F.2d at 534. The ALJ did not do this here. The court has no means by which to determine whether the ALJ complied with this requirement, as his opinion

43

is devoid of any such findings. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *See Vega v. Comm'r*, 265 F.2d 1214, 1219 (11th Cir. 2001).

In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Before the court in this case are multiple medical opinions concerning the nature, origins, and severity of plaintiff's disability due to numerous mental and physical ailments from which the record demonstrates she has suffered for decades. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file. These records support a conclusion that the plaintiff does have significant limitations. Therefore, the court will remand this case to the ALJ to consider properly the evidence in the record, including the effect of the combination of plaintiff's impairments on plaintiff's ability to work, to obtain a further physical consultative evaluation if necessary, for proper application of the law, and any further development of the record deemed necessary for these purposes.

**Conclusion**

Based on the lack of substantial evidence in support of the ALJ's findings, as well as the ALJ's failure to consider the combination of plaintiff's impairments and their effect on plaintiff's ability to work, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED** and this case is **REMANDED** to the Agency for further action consistent with this opinion, as set forth herein.

**DONE** and **ORDERED** this the 12th day of June 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE